## MORGAN v. WILKERSON.

[No. 26,150. Filed July 29, 1932. Rehearing denied December 14, 1932.]

Joseph W. Verbarg, William F. Fitzgerald, Thomas H. Branaman, and Wycoff & Wycoff, for appellant.

Dixon & Meloy, and Montgomery & Montgomery, for appellee.

MARTIN, J.—Wilkerson, the appellee, and Morgan, the appellant were opposing candidates for the office of Trustee of Montgomery Township in Jennings County at the 1930 election. The board of canvassers declared Morgan elected and issued to him a certificate of election, under which he qualified and took possession of the office January 1, 1931. Within ten days after the election in November, 1930, Wilkerson procured a recount of the ballots and filed with the county auditor a contest proceeding (§7613 Burns 1926). The recount commissioners certified that Wilkerson received a majority of the ballots, and upon a hearing before the board of commissioners of Jennings County, he was adjudged duly elected to the office. Morgan appealed from the decision of the board of county commissioners (§7616 Burns 1926) to the Jennings Circuit Court. A change of venue was taken to the Jackson Circuit Court, which, after a trial on October 26, 1931, adjudged that Wilkerson had been duly elected as trustee. Wilkerson within ten days thereafter took an oath of office and filed an

official bond with the Auditor, who approved the same. From the judgment of the Jackson Circuit Court this appeal was taken. The transcript of the record was filed in this court on January 6, 1932, and the cause was submitted February 5, 1932.

On May 2, 1932, Morgan filed with the county auditor his resignation as trustee effective immediately and thereupon the Board of County Commissioners, being in session, accepted the resignation and purported to appoint Ossie Morgan as trustee "to fill the unexpired term of said Jesse T. Morgan." On May 3, 1932, Jesse T. Morgan died. By reason of these facts the appellee Wilkerson, on May 20, 1932, moved the court to dismiss this appeal on the ground that the appeal was abated. The attorneys for the appellant Morgan filed a verified objection to the motion to dismiss, admitting the facts but alleging "that said facts . . . are not sufficient in law or in equity to cause the abatement of this appeal" and praying that the motion to dismiss the appeal be denied.

The resignation of Morgan from the office of Township Trustee served to divest him of authority thereafter to hold the office, (if he had such authority by reason of the election). After Morgan's resignation there could no longer be a contest between him and Wilkerson as to which one of them had the right to thereafter occupy the office. But while Morgan's resignation eliminated controversy by him as to whom thereafter had the right to occupy the office, it did not settle the controversy between him and Wilkerson as to who was elected to the office and who was entitled to the emoluments thereof up to the time of his resignation. A final judicial determination of the question of which candidate for public office received the most legal votes is a matter of public interest, and the legislature has also indicated that such contest also in-

volves the right of the contesting party to the emoluments of the office, (by §7622 Burns 1926, relating to the appeals of election contests, which provides that the appeal bond shall be in a sum sufficient to cover the emoluments of the office, and which provides for a right of action on such bond). *Kensinger* v. *Schaal* (1928), 200 Ind. 275, 161 N. E. 262.

The decision of this appeal will determine the question of who was elected trustee of Montgomery township. If the judgment of the lower court is affirmed, then it would be settled that Morgan was not elected, that when he resigned and abandoned the office which he held by virtue of a certificate incorrectly issued by a canvassing board, no vacancy existed in the office for the county commissioners to fill by appointment, because by virtue of the judgment of the Circuit Court, Wilkerson who had qualified, was the lawful Trustee. If the judgment of the lower court is reversed then it would be settled that Wilkerson was not legally elected and that at the time the county commissioners appointed Ossie Morgan trustee a vacancy existed and they had lawful authority to make such appointment.

On June 9, 1932, appellee Wilkerson filed a second motion entitled a "motion to strike out brief and dismiss appeal". In this he seeks to have the appellant's brief, which was filed May 27, 1932, stricken out on the ground that the death of Morgan, on May 3, 1932, terminated any existing employment of his attorneys and terminated the relation of attorneys and client existing between him and them; and he seeks to have the appeal dismissed on the ground that there is now no party appellant because no substitution of party appellant was made after Morgan's death.

The statutes provide that the death of any party after the submission of a cause on appeal does not cause the proceedings to abate, but the judgment to be rendered

will be rendered as at the term at which the submission was made without any change of parties. §§729, 710 Burns 1926. The attorneys of record at the time of the submission of the appeal not only have the right, but it is their duty to brief the appeal.

The motion to strike out the appellant's brief and the motions to dismiss the appeal are overruled.

The appellant assigns as error the overruling of his motion for a new trial, (wherein it is alleged that the decision of the court is not sustained by sufficient evidence and is contrary to law), and presents thereunder the correctness of the trial court's decision that two ballots—Exhibits 1 and 2—were valid. The court found that appellee Wilkerson received 188 legal votes (including Exhibits 1 and 2) and that appellant Morgan received 187 legal votes. It was agreed and stipulated in evidence by the parties that the two contested ballots "are authentic and genuine, and in the condition in which they were at the close of the election and may be offered in evidence . . . without objection, except on the grounds substantially as stated above" (that the same were mutilated and bear distinguishing marks).

The two ballots in controversy, are in the record and we have examined them. Each has a small, faint ink mark on its face near the bottom, the ink being of the same color as that used in affixing the initials of the poll clerks (on the back of the ballots). The ink mark on each ballot is oblique, is irregular in shape and is in the same relative location on the ballot. The mark on one ballot is a faint blur three-eighths of an inch long and less than one-eighth of an inch wide at its widest point. The mark on the other ballot consists of three parts separated by spaces,—the lowest part is a faint blur three-eighths of an inch long, less than one-eighth of an inch at the base and running up to a point, and

above this, separated by spaces (three-sixteenths and three-eighths of an inch long respectively), are two narrow lines,—one-fourth and one-eighth of an inch long respectively. The marks on both ballots were apparently made by ink accidentally escaping from a pen, the back of which was applied to the edge of the ballot in lifting it. There is evidence that these ink marks were made by the election officers and that one of the election clerks, who remained seated and handed the ballots across the desk to the voters, raised up some of the ballots with the point of his pen.

A voter testified that "Exhibit No. 1 is my ballot or one exactly like it" and another voter testified regarding Exhibit No. 2 that "I voted a ticket like that at the election. If it is the only one like it in the box . . . it is mine, but if there is more than one I won't say". Each of these voters testified that he (and she) observed a small ink mark on his (and her) ballot while voting it (i. e. while marking it preparatory to its being deposited in the ballot box).

Section 7526 Burns 1926 concerning canvassing and counting votes and disputed ballots provides that:

> "Any ballot which shall bear any distinguishing mark or mutilation, shall be void, and shall not be counted."

Section 7497 Burns 1926, governing the manner of voting and marking ballots provides:

> "The voter shall . . . indicate the candidate for whom he desires to vote by making a cross, thus, x, on the square immediately preceding their names. . . . A mark on the ballot in violation of this provision shall be treated as a distinguishing mark."

Section 7524 Burns 1926, concerning distinguishing marks and the penalty for making the same, provides:

> "No inspector . . . shall deposit . . . any ballot on which appears externally any distinguishing

mark. . . . If any inspector . . . or other person entrusted with the custody or control of any ballot . . . either before or after they have been voted, shall in any way mark, multilate or deface any ballot, either for the purpose of identifying the same . . . or for the purpose of vitiating the same, he shall be guilty of a felony," etc.

The evidence is sufficient to sustain the finding and the same is not contrary to law. The trial court, under the evidence, was entirely justified in holding that the marks on Exhibits 1 and 2 were not, within the meaning of the law, distinguishing marks. It reasonably appears that the marks were accidentally placed on the ballots by an election clerk but were not placed there "for the purpose of identifying the same . . . or vitiating the same".

The marks on the contested ballots here, even if made by the voters, could not be considered "distinguishing marks". "While technically they are marks other than crosses within circles or squares as designated by the statute, . . . they are not distinguishing marks such as the act contemplates shall render the ballot void". *Spaulding* v. *Romack* (1916), 185 Ind. 105, 113, 113 N. E. 229, 231. "A distinguishing mark that will invalidate a ballot is such a one as fairly imports upon its face a design and a dishonest purpose. The slight soiling of a ballot, which reasonably appears to have been the result of accident or want of due care, is not sufficient to condemn it, if otherwise fair." *Tombaugh* v. *Grogg* (1901), 156 Ind. 355, 363, 59 N. E. 1060. "It is some sort of a mark put upon the ballot to indicate who cast it and to furnish the means of evading the law as to secrecy". *Winn* v. *Blackman* (1907), 229 Ill. 198, 82 N. E. 215, 220, 120 Am. St. Rep. 237. "It is purity of election and a free and honest expression of the voter's will, that is aimed at, and a substantial compliance with the law in the execution of the ballot will suffice if the

general appearance of the ballot is such as to clearly indicate an honest effort by the voter to comply with the law, and his choice of candidates may be clearly ascertained." *Borders* v. *Williams* (1909), 155 Ind. 36, 43, 57 N. E. 527, 529.

The appellant contends that the slight marks upon the two ballots in question were such mutilations as should have caused the voters to return the ballots to the clerk and to secure other ballots, and that their failure to do so invalidated their ballots and sacrificed their right of suffrage. By voting the ballots, appellant says, "each voter adopted such unlawful mark as his own, ratified it, and is charged with the act of placing it upon the ballot."

Section 7522 Burns 1926 provides that "any person who shall by accident or mistake spoil, deface or mutilate his ballot may, on returning the same to the poll clerks, and satisfying them that such spoiling, defacing or mutilation was not intentional, receive another in place thereof. . . ." This statute relates to mutilations by the voter. While a serious spoilation, mutilation or distinguishing mark on a ballot when received by a voter from the election officials should cause the voter to call the attention of the election officials to it, for the purpose of protecting the legality of his vote, we cannot say that there was any duty upon the voter to do so in this case, where the mark consisted of a small, faint trace of ink that might easily have been overlooked.

The appellant further argues that by means of the ink marks the two voters upon the witness stand identified Exhibits 1 and 2 as being the ballots voted by them and that therefore such ballots were in fact mutilated and distinguishable from any other ballots cast. Reference to the evidence shows that neither of the voters positively identified these ballots

although each noticed a pen scratch or blot on the ballot he (and she) voted. Their evidence that such marks existed was not evidence that distinguishing marks sufficient to invalidate the ballots existed. The irregular ink marks or blurs were not such as could be accurately described as to their form and "we do not see how a voter could with any certainty describe such mark(s) so that another person would be able with certainty to identify the ballot(s)". *Winn* v. *Blackman, supra.*

Judgment affirmed, as of the date of submission.

## DISSENTING OPINION.

TREANOR, J., ROLL, C. J.—We agree that the reasoning and the result reached in the majority opinion are in harmony with previous decisions of this Court. We are convinced, however, that these earlier decisions have adopted an interpretation of the term "distinguishing mark" which is not justified by statutory provisions and which nullifies the intent of the statutes and runs counter to the evident legislative policy back of these statutes. The earlier decisions, and the decision in this case, assume that there may be "distinguishing marks" upon a ballot which "are not distinguishing marks such as the act contemplates shall render the ballot void". *Spaulding* v. *Romack* (1916), 185 Ind. 105, 113, 113 N. E. 229, 231. The majority opinion states that "it reasonably appears that the marks were accidentally placed on the ballots by an election clerk but were not placed there 'for the purpose of identifying the same . . . or vitiating the same'." We think that the only time that it becomes material to determine the purpose for which distinguishing marks are placed upon a ballot is when any election official is being tried on a criminal charge under §7524 Burns Ann. Ind. St. 1926. Section 7526 Burns, *supra,* provides, without qualification, that "any ballot which shall bear any distinguishing mark

or mutilation shall be void and shall not be counted". Section 7497 Burns, *supra,* prescribes that a voter shall indicate the candidates for whom he desires to vote by making a cross on the square immediately preceding their names; and then, without qualification, provides that "a mark on the ballot in violation of this provision shall be treated as a distinguishing mark." In short there is nothing in the statute to indicate that the purpose for which, or the form in which a "distinguishing mark" appears upon a ballot is material. It is our belief that neither election officials nor courts can consider any evidence except the ballot itself for the purpose of determining whether a distinguishing mark appears upon a ballot, except in case of criminal proceedings where the statute expressly makes purpose or intent an element of the crime. In *Sego* v. *Stoddard* (1894), 136 Ind. 297, 306-307, 36 N. E. 204, are found the following statements by this Court:

"Criminal statutes imposing severe penalties against the crime had proven but idle and powerless fulminations, at which both the buyer and seller laughed, feeling that their mutual interest would hold the secret of their crime against free government securely locked in their breasts. So that the statute was the outgrowth of the desire of all to rid the state of the burning disgrace and ominous danger to popular government. And the leading idea and thought of the whole act was not to afford relief against the fraud of vote buying and bribery at elections after its commission, but it was to devise a plan by which the honest voter could not only be freed from intimidation by making his vote a secret known only to himself and his God, but it was to absolutely shut the door against making merchandise of his vote by the corruptible voter as near as human ingenuity could devise such a plan. That the plan has proven eminently successful is evidenced by the fact that all political parties warmly approve the law, and that thirty-odd of our sister states have since substantially adopted it.

"The idea was not, as appellant's counsel seem to

think, to so provide as to render it impossible for the purchased or bribed voter to afterwards identify the ticket he voted by looking at and inspecting it, because the other provisions of the act provide for a destruction of the ballots after they are counted, and before anybody except the officers can see them. But it was to guard against the possibility of the vote seller indicating to the buyer in advance how his ballot would be distinguished from the other ballots in the box, so that the buyer or his agent, who may be one of the election officers, could tell, when the bribed voter's ballot was reached in the count, that such bribed voter had carried out his contract.

"It was believed that if it could be rendered impossible for the buyer or his agent to identify the ballot voted by the purchased voter from a mere indication beforehand how it should be marked, the desired end would be reached, because it was believed that, as a general thing, a vote buyer would not risk his money on a vote seller without some assurance other than the mere word of the bribed voter."

We think the proper test of a distinguishing mark is whether it makes it possible for the ballot to be distinguished from the other ballots in the box and not whether the mark in question was put upon the ballot for the purpose of vitiating or even identifying the ballot.